## UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JEFFREY FINK,<br><br>     Plaintiff<br><br>     V.<br><br>SUN LIFE INSURANCE AND ANNUITY COMPANY OF NEW YORK, SUN LIFE ASSURANCE COMPANY OF AMERICA, AND PROSKAUER ROSE LLP LONG TERM DISABILITY PLAN,<br><br>     Defendants | CIVIL ACTION NO. 05-10001-RWZ |

## <u>FIRST AMENDED COMPLAINT</u>

### INTRODUCTION

1. Plaintiff, Jeffrey Fink ("Mr. Fink"), brings this action against Defendants, Sun Life Insurance and Annuity Company of New York ("Sun Life"), Sun Life Assurance Company of America ("Sun Life Assurance Company") and the Proskauer Rose LLP Long Term Disability Plan ("Plan"), for violation of the Employment Retirement Income Security Act of 1974, as amended, 29 U.S.C. §1001 *et. seq*. (ERISA). Mr. Fink is a participant in the Plan, an ERISA welfare benefit plan whose claims administration is handled by Sun Life. The Plan is fully insured by a policy of insurance issued by Sun Life. The policy number is 86216.

2. This Complaint challenges the Defendants': 1) unreasonable and unlawful denial of Mr. Fink's long term disability ("LTD") income benefits despite the substantial

medical evidence demonstrating Mr. Fink's qualifications for said benefits; 2) pattern of rejecting and/or ignoring the substantial evidence supporting Mr. Fink's total disability pursuant to the terms of the Plan; 3) failure to provide Mr. Fink with a full and fair review of his claim; and 4) failure to provide a reasonable claims procedure that would yield a decision on the merits of Mr. Fink's claim.

3. Mr. Fink is filing this action to recover benefits due under the Plan, to enforce the present rights existing therein, to clarify rights under the terms of the Plan, and to recover costs and attorneys=fees as provided by ERISA.

## JURISDICTION

4. This court has personal and subject matter jurisdiction over this case under 29 U.S.C. 1132(e)(2) and (f), without regard to jurisdictional amount or diversity of citizenship, in that the Plan is administered in this district.

## PARTIES

5. Mr. Fink is a 41-year-old individual who currently resides in Wellesley, Massachusetts.  Mr. Fink is a vested participant in an employee benefit plan, within the meaning of 29 U.S.C. ' 1002(2)(7).  Mr. Fink has standing to bring this action under 29 U.S.C. ' 1132(a).

6. The defendant, Sun Life Insurance and Annuity Company of New York, is a for-profit corporation, with its principal place of business at 122 East 42nd Street New York, New York, 10017.   Sun Life transacts business in Massachusetts and underwrites the Policy under which Mr. Fink is suing.

7. Sun Life Insurance and Annuity Company of New York is the party responsible for processing the claims made under the Plan and making a final determination

as to Plan participants' eligibility for LTD benefits.

8.  Sun Life Insurance and Annuity Company of New York is a wholly-owned subsidiary of Sun Life Assurance Company of America.

9.  Sun Life Assurance Company of America is a for-profit corporation with its principal place of business at One Sun Life Executive Park, Wellesley Hills, MA 02481.

10. At all times relevant to the claims asserted in this Complaint, Sun Life purported to act as an ERISA claims fiduciary with respect to participants of the plan, generally, and specifically, with respect to Mr. Fink, within the meaning of ERISA.

11. The Plan under which Mr. Fink is suing is a "long-term disability plan" issued by Sun Life to Proskauer Rose LLP, a for-profit corporation with its principal place of business at 1585 Broadway, New York, NY 10036-8299.   The policy number is 86216.

## STATEMENT OF FACTS

**Insurance Entitlement, Definitions of Disability, Discretion**

12. At the time he became disabled under the terms of the Plan, Mr. Fink was an attorney at the law firm of Proskauer Rose LLP in New York.

13. As an employee of Proskauer Rose LLP, Mr. Fink was entitled to LTD benefits under a contract of insurance between Proskauer Rose LLP and Sun Life.

14. Sun Life both funds and administers the Plan under which Mr. Fink is suing.

15. Under the terms of the Plan, neither Sun Life, Sun Life Assurance Company, nor Proskauer Rose LLP has discretionary authority to determine a claimant's

eligibility for LTD benefits and to interpret the terms and provisions of the Plan.

16. Under the terms of the Plan, Mr. Fink is entitled to receive 60% of his monthly earnings per month.

17. The maximum period of payment under the Plan is age 70.

18. The Plan defines "total disability" as follows:

> **Total Disability or Totally Disabled** means during the Elimination Period and the next 24 months of Total Disability, the Employee, because of Injury or Sickness, is unable to perform all of the material and substantial duties of his own occupation. After benefits have been paid for 24 months, the Employee will continue to be Totally Disabled if he is unable to perform all of the material and substantial duties of any occupation for which he is or becomes reasonably qualified for by education, training or experience.
>
> The loss of a professional or occupational license or the inability to obtain or qualify for a license for any reason does not, in itself, constitute Total Disability.
>
> To qualify for benefits, the Employee must satisfy the Elimination Period with the required number of days of Total Disability, Partial Disability or a combination of Total or Partial days of Disability.

## Mr. Fink's Claim for LTD Benefits

19. Mr. Fink presented a timely claim to Sun Life, asserting that he is an insured person, that he became totally disabled while insured, and that he is entitled under the Plan to LTD benefits for the period of time beginning in March 2004, when Sun Life and Sun Life Assurance Company wrongfully denied his benefits, and continuing thereafter without interruption through to the present, and continuing in the future until he reaches the age of 70 or is no longer either totally or partially disabled.

4

**Onset of Disability and Diagnoses**

20. At the time he became disabled, Mr. Fink was an associate and then Senior Counsel in the Corporate Department of Proskauer Rose LLP. A few months after he left work, based on his performance prior to becoming disabled and in the hope he would return, Mr. Fink was promoted to Senior Counsel.

21. The areas of Mr. Fink's practice focused on venture capital, leveraged buyout and other private equity funds; mergers and acquisitions; complex partnership arrangements; and the financing of businesses including banking and securities law matters.

22. In late 1990, Mr. Fink knocked himself unconscious on the top of a loft while jumping to get a telephone.

23. In early 1991, Mr. Fink began experiencing severe fatigue and concentration difficulties. Over a period of about two months, Mr. Fink's visual acuity decreased from approximately a minus 5 to a minus 8. He also began to awaken during the night due to an unpleasant crawling sensation in his legs.

24. In July 1992, Mr. Fink's fatigue returned. At that time, he was diagnosed as having chronic fatigue syndrome or fibromyalgia and given a low dose (25 mg) of Elavil to take at bedtime. Mr. Fink continued on various fibromyalgia medications through August 1999.

25. In February 1999, Mr. Fink developed an illness marked by a high fever (approximately 104º), extreme shortness of breath and a headache. The

initial diagnosis by Dr. Gibson, who was covering for Mr. Fink's regular internist, was pneumonia, which Dr. Gibson treated with oral Trovan. Shortly after he began taking the antibiotic, Mr. Fink became extremely dizzy, with a sensation like jolts of electric currents running through his head. The symptoms were so severe that Mr. Fink had trouble getting out of bed.

26. After ten days on the antibiotic, Mr. Fink was examined by Dr. DiFabrizio, a pulmonologist. Dr. DiFabrizio indicated his belief that Mr. Fink had been misdiagnosed and never had pneumonia. He suggested that Mr. Fink be evaluated by a rheumatologist, Dr. Lee, for possible autoimmune costochondritis.

27. Mr. Fink was subsequently examined by Dr. Lee, who noticed some liver dysfunction, a mild case of fibromyalgia as indicated by some trigger point sensitivity, and possibly seronegative arthritis that, in combination with a case of bronchitis, could have caused the symptoms he was experiencing.

28. Mr. Fink's concentration abilities and his vision were never quite the same from that time forward. He had difficulty finding the energy to get through the day, his eyes seemed to tire from reading much more easily than before, and he began skipping words while reviewing documents. Mr. Fink also seemed to lose his quantitative skills overnight.

29. In the summer of 1999, Mr. Fink began to experience severe headaches accompanied by blurred vision and painful sensitivity to light. These

headaches and their accompanying symptoms caused Mr. Fink to miss many days of work and to leave work early.

30. In late July 1999, Mr. Fink experienced another fever accompanied by a severe headache.  A few days later, at the beginning of August, while sitting at his desk, Mr. Fink experienced short but intense bursts of vertigo that resembled the electric shocks he had felt in February, 1999.  At the same time, Mr. Fink began experiencing great difficulty getting out of bed, lightheadedness, dizziness, imbalance and nausea.  After the first day or so, the shock sensations ended; after the first week or so, the spinning dizziness was reduced to sporadic instances, but the sense that he was moving continued for hours at a time on a daily basis.  Mr. Fink also had startling visual disturbances.

31. Mr. Fink also began experiencing overwhelming fatigue, which caused him to sleep 12-14 hours a day.  Often when awake, Mr. Fink spent a lot of time sitting in a chair, staring into space.  Walking became exhausting for Mr. Fink, as well.

32. Mr. Fink was unable to read or write for any significant length of time without experiencing blurry vision, dizziness and nausea.

33. On August 23, 1999, Mr. Fink attended a meeting with clients for a few hours.  During the meeting, he became extremely nauseated as he tried to read the document he was discussing and had trouble following the conversation.

34. Mr. Fink's last day of work was August 23, 1999.

35. Since August 23, 1999, Mr. Fink has been diagnosed with brain injury, vestibular migraines secondary to the brain injury, cervical myofascial pain, as well as cervical facet dysfunction, and severe periodic limb movements in sleep.

36. Mr. Fink's symptoms include: fatigue, headaches, dizziness, vision problems, heightened sensory problems, restless limb sensation, attention and concentration difficulties, memory loss, organizational difficulties, difficulty in following-through with tasks, stress-related decompensation and irritability.

37. Since the onset of his disability, Mr. Fink has made innumerable efforts to recover or to improve his health, including: 1) consulting with over 34 doctors and other treatment providers ; 2) attempting over 30 different prescription medications for his disabling symptoms.; 3) attempting 5 kinds of mainstream therapy including vestibular rehabilitation therapy, occupational therapy, cognitive remediation therapy, physical therapy, and psychotherapy; 4) undergoing surgery on his sinuses, it an effort to alleviate his dizziness; 5) trying numerous complementary and alternative medicine treatments, including EEG biofeedback therapy (using scientific, peer-reviewed methods), a long series of acupuncture treatments by a Chinese-trained physician, cranial-sacral therapy, meditation, Reiki and yoga; 6) trying numerous herbal and other non-prescription supplemental treatments, as well as herbal medicine prescribed by a traditional Chinese medicine doctor; 7) implementing many behavior and lifestyle changes; 8)

moving to a quieter place to reduce his level of sensory stimulation; and 9) engaging in a self-motivated work hardening program.

## Application for LTD Benefits

38. Under the recommendation of his treating physicians, Mr. Fink applied for long-term disability benefits under his individual Northwestern Mutual disability policy and his group Sun Life policy following his last day of work on August 23, 1999.

39. Mr. Fink began receiving benefits from Northwestern Mutual in December 1999, following the conclusion of his elimination period for qualification for benefits.

40. Sun Life also approved Mr. Fink's claim for long-term disability benefits, with a payment onset date of February 2000.

## Vocational Rehabilitation/Volunteer Work

41. Over the years, Mr. Fink has regularly spoken with both insurers, and at Sun Life's request, various vocational rehabilitation counselors. Sun Life's vocational counselor indicated that Mr. Fink was extremely motivated to return to work, and communicated this information to Sun Life.

42. In the spring of 2002, to build his stamina, Mr. Fink began performing volunteer work. This course of activity was suggested to Mr. Fink by his physiatrist, Dr. Edwin Richter.

43. Originally, Mr. Fink began volunteering two mornings a week at NYU Medical Center as a patient representative assistant. A few months after Mr. Fink moved to Massachusetts, he started spending one morning a week as a patient representative at Newton-Wellesley Hospital.

44. In the spring of 2003, Mr. Fink received training under the Massachusetts Department of Elder Affairs' Long-Term Care Ombudsman Program, and began spending an hour or two each week identifying and attempting to resolve problems raised by residents of Marist Hill Nursing Home in Waltham.

45. In the summer of 2003, Mr. Fink began working one morning a week as a consumer dispute mediator with the Consumer Assistance Center – Metrowest, Inc.

**<u>Sun Life's Termination of Mr. Fink's Claim for LTD Benefits</u>**

46. Near the end of 2003, Mr. Fink's Sun Life vocational claim handler was removed from his claim. At that time, Lisa Doherty-Shelton and Jason Binette of Sun Life took over the handling of Mr. Fink's claim.

47. In December 2003, at Sun Life's request, Mr. Fink underwent an insurance medical examination with Dr. Michael Alexander. Dr. Alexander issued an equivocal report, neither supporting or opposing Mr. Fink's total disability status.

48. On February 27, 2004, Ms. Doherty-Shelton called Mr. Fink notifying him that his claim had been terminated.

49. On March 3, 2004, Sun Life wrote Mr. Fink, terminating his claim for total disability benefits.

50. On March 7, 2004, Mr. Fink, through counsel, requested a complete copy of Mr. Fink's claim file in order to adequately respond to Sun Life's denial of Mr. Fink's claim.

51. On April 13, 2004, counsel for Mr. Fink wrote Sun Life requesting information missing from Mr. Fink's claim file.

52. On April 22, 2004, Jason Binette, the author of Mr. Fink's termination letter, wrote counsel for Mr. Fink indicating that she "[has] been provided with the entire claim file for Mr. Fink."

53. To date, Mr. Fink has not been provided with all relevant documents pertinent to Sun Life's review of and denial of his claim for benefits.

**Mr. Fink's Appeal of Sun Life's Decision to Deny LTD Benefits**

54. On August 3, 2004, Mr. Fink, through counsel, appealed Sun Life's decision to deny him LTD benefits.

55. Mr. Fink's appeal included numerous affidavits supporting his total disability; narrative reports from his treating and examining physicians describing the basis for their conclusion that Mr. Fink was totally disabled; medical information regarding Mr. Fink's illnesses to respond to Sun Life's erroneous understanding of the nature of the illnesses; and updated medical records.

56. Mr. Fink's claim was also supported by his three treating physicians, Drs. Neera Kapoor, Edwin Richter and Dana DeWitt.  Dr. Kapoor is an expert in optometry and vision and an Assistant Clinical Professor at SUNY-State College of Optometry.  Dr. Richter is a Physiatrist at the Rusk Institute for Rehabilitation Medicine, an Associate Clinical Director at the Rusk Institute of Rehabilitation Medicine and a Clinical Assistant Professor in the Department of Rehabilitation Medicine at New York University.  Dr. DeWitt is a neurologist in private practice at Newton-Wellesley Neurology Associates.  Dr. DeWitt is also an Assistant Professor at Tufts University School of Medicine.

57. Mr. Fink's appeal also contained an independent consultation report with an

expert in physical medicine and rehabilitation, Joanne Borg-Stein, M.D. Dr. Borg-Stein is the Chief of Service of Physical Medicine and Rehabilitation at Newton-Wellesley Hospital. She is a Clinical Professor at Harvard University School of Medicine and is Board Certified in Physical Medicine and Rehabilitation, with a sub-specialty certificate in Pain Management.

58. After extensive examination of Mr. Fink, Dr. Borg-Stein certified Mr. Fink as totally disabled.

59. Mr. Fink's appeal also included an independent vocational examination report rendered by Paul R. Blatchford, Ed.M., a vocational expert. On April 1, 2004, Mr. Blatchford evaluated Mr. Fink after a review of his medical records, an in-person interview, and objective testing, concluding:

> It is my opinion, based upon a review of records provided, results of standardized vocational tests, and my evaluation of him, Mr. Fink does not possess the residual functional capacity of a vocational nature to perform, or more importantly, sustain, his past relevant skilled work as a Corporate Lawyer. It is further my opinion that at this juncture, Mr. Fink does not possess the residual functional capacity of a vocational nature to perform, or sustain, the duties of any occupation on a full- or part-time basis.

60. On August 13, 2004, Jason Binette, the Sun Life Benefits Analyst who rendered the decision terminating Mr. Fink's claim, wrote counsel for Mr. Fink acknowledging receipt of Mr. Fink's appeal, indicating that "[t]his information and your entire claim file will be reviewed during the appeal process."

61. Mr. Binette's August 13, 2004 letter further indicated that Sun Life "will make a decision on review within a reasonable period of time, but not later than 45 days or September 22, 2004, following receipt of your appeal request unless special circumstances require an extension of time for processing."

62. Following the submission of his appeal document, Mr. Fink, through counsel, supplemented the information contained therein with additional medical reports and records, affidavits, including a supplemental affidavit from Mr. Fink, physical therapy records, and medical literature.

63. On September 20, 2004, Mr. Binette wrote counsel for Mr. Fink requesting an additional 45 days to conduct "a proper review of your client's claim. This extension will end on November 5, 2004."

64. On October 8, 2004, counsel for Mr. Fink wrote Mr. Binette, requesting the following:

    Moreover, if Sun Life conducts a medical or vocational review of Mr. Fink=s file, whether internal or external, I would appreciate it if Sun Life would permit Mr. Fink=s treating physician(s) and vocational examiner to respond to the review(s) prior to a final determination on Mr. Fink=s claim for benefits. This would ensure that Sun Life conducts a full and fair review of Mr. Fink=s claim prior to making a final determination.

65. Sun Life did not respond to this letter.

66. On October 25, 2004, Mr. Binette called counsel for Mr. Fink informing her that he had sent Mr. Fink's appeal to Dr. Alexander for review. Mr. Binette further indicated that he would review Dr. Alexander's review of Mr. Fink's appeal, and would make an initial determination on Mr. Fink's appeal. Mr. Binette also stated that if he was unable to reverse his initial decision on Mr. Fink's claim, he would send Dr. Alexander's review to counsel for Mr. Fink.

67. Contrary to Mr. Binette's statements, and Mr. Fink's regular requests for a copy of Dr. Alexander's report, Sun Life did not forward Dr. Alexander's report to Mr. Fink until February 18, 2005, two months after it was received by Sun Life.

68. During the October 25, 2004 conversation, Mr. Binette requested an additional 45 days to review Mr. Fink's claim for benefits, as Sun Life had not received a copy of Dr. Alexander's record review. This was Sun Life's second request for an extension of time to review Mr. Fink's appeal.

69. The ERISA regulations only provide insurers with a total of 90 days to review an appeal of a denial of benefits.

70. During the October 25, 2004 conversation, Mr. Binette indicated that if Sun Life's review of Mr. Fink's claim were to extend beyond November 5, 2004, Sun Life would reinstate Mr. Fink's benefits under a reservation of rights pending a final determination on his claim.  Mr. Binette indicated that Sun Life has reinstated benefits under a reservation of rights in similar circumstances, when its review extended beyond the original 90-day period for review of a claimant's appeal.

71. On October 28, 2004, counsel for Mr. Fink engaged in a conference call with Mr. Binette and Lisa Doherty-Sheldon, Mr. Binette's supervisor.  At the outset of this conversation, counsel for Mr. Fink indicated that Mr. Fink would assent to an extension of time for Sun Life's review with a reinstatement of benefits under reservation of rights.  In response, Ms. Doherty-Sheldon indicated that Mr. Binette incorrectly indicated that benefits would be reinstated under a reservation of rights, pending the completion of Sun Life's review.

72. During the October 28, 2004 conversation, Ms. Doherty-Sheldon further confirmed that Sun Life had not transferred Mr. Fink's claim to the appeals department at Sun Life, but rather, Mr. Binette had spent the entire prior 90 days re-reviewing Mr. Fink's claim.  Ms. Doherty-Sheldon indicated that an additional

45 days was required for Mr. Binette to complete his re-review of Mr. Fink's claim, and for the appeals department to complete its review.

73. Until this date, Mr. Fink was unaware that Sun Life's appeals unit had never even seen his claim.

74. In response, Mr. Fink, through counsel, requested that Sun Life pay one month of benefits under a reservation of rights to accommodate the additional time Sun Life requested for the appeal review.

75. Sun Life denied Mr. Fink's request.

76. Mr. Fink assented to Sun Life's request for additional time to review his claim, despite its withdrawal of its offer to pay Mr. Fink's benefits under a reservation of rights.

77. On December 2, 2004, Mr. Fink, through counsel, forwarded Sun Life a copy of an Independent Medical Examination ("IME") report of Mel Glenn, M.D. as well as Mr. Fink's Social Security Disability Insurance ("SSDI") award letter.

78. On October 28, 2004, Mr. Fink underwent an IME with Mel Glenn, M.D.  Dr. Glenn is one of America's most highly regarded physicians specializing in brain injury and other acquired neurological deficits.  He is the Director of Outpatient and Community Brain Injury Rehabilitation at Spaulding Rehabilitation Hospital, a Professor at Harvard Medical School and the Project Director for the Spaulding/Partners Traumatic Brain Injury Model System at Harvard Medical School.  Before moving to Harvard, Dr. Glenn was the Chairman of the Department of Physical Medicine and Rehabilitation at Boston University

Medical School and Chairman of the Department of Rehabilitation at Boston Medical Center.

79. After examining Mr. Fink and conducting a physical and mental status examination, Dr. Glenn concluded:

> **IMPRESSION**:  Mr. Fink has a complex set of symptoms that are probably related to both a mild traumatic brain injury in 1990 and an infectious disease in 1999.  His fatigue, cognitive impairment and dizziness render him totally disabled and unable to work competitively.

80. On or about December 12, 2004, counsel for Mr. Fink wrote Mr. Binette requesting "a complete copy of all documents placed in Mr. Fink's claim file since Sun Life's last disclosure . . ."

81. Sun Life did not respond to this letter.

82. On or about December 12, 2004, counsel for Mr. Fink wrote Mr. Binette regarding its financial conflict of interest in administering Mr. Fink's claim, as evidenced by emails regarding Sun Life's administration of its long-term disability claims.  The emails detail a proposed lottery at Sun Life entitled "Kicking it Up a Notch," whereby Sun Life employees were provided chances at winning gift certificates for meeting quotas for closures or terminations of claims.

83. While Mr. Fink believes this email was later retracted by its author, Sun Life has not responded to Mr. Fink's December 12, 2004 letter regarding the processing of claims through the use of a quota system.

84. Mr. Binette was a recipient of the email regarding the "Kicking it Up a Notch" contest.

85. On or about December 12, 2004, counsel for Mr. Fink wrote Mr. Binette regarding the delay in Sun Life's review of Mr. Fink's claim. In particular, the letter stated:

> It has been approximately 38 days since the completion of Sun Life's 90-day period of time for reviewing Mr. Fink's claim. As Sun Life has not requested additional time to complete its review of Mr. Fink's appeal, we expect to receive a determination as to Mr. Fink's continued eligibility for benefits no later than December 20, 2004.

86. Sun Life did not respond to this letter.

87. On or about December 14, 2004, counsel for Mr. Fink called Mr. Binette to inquire as to the status of Sun Life's review of Mr. Fink's claim.

88. On or about December 14, 2004, Mr. Binette left counsel for Mr. Fink a telephone message indicating that Mr. Fink's file had been transferred to the appeals department for review.

89. On or about December 15, 2004, Morse Doane, an appeals examiner at Sun Life, indicated to counsel for Mr. Fink that he had just received Mr. Fink's file from Mr. Binette, and was beginning his review of Mr. Fink's claim.

90. The additional 45 day extension Mr. Fink agreed to provide Sun Life in response to its request expired on December 20, 2004.

91. On December 21, 2004, Mr. Doane wrote counsel for Mr. Fink requesting approximately one additional month, until January 14, 2005, to complete his review of Mr. Fink's appeal.

92. On January 3, 2005, Mr. Fink, following a conversation with Mr. Doane, sent Mr. Doane a copy of his Complaint filed that day. Mr. Fink agreed to accommodate Sun Life's request for an extension to review his claim by not serving the

complaint until after the date set by Mr. Doane for completing his review, or January 14, 2005.

93. On or about January 14, 2005, Mr. Doane wrote counsel for Mr. Fink requesting, pursuant to ERISA and its associated regulations, "additional time to complete a full and fair review of Mr. Fink's claim on appeal."  Mr. Doane's letter contained an incomplete chronology of events following Sun Life's termination of Mr. Fink's claim, and asserted that "any alleged delay on Sun Life's part in reaching a decision regarding Mr. Fink's appeal has been caused, almost exclusively, by factors not within Sun Life's control."  In particular Sun Life claimed that the volume of information submitted by Mr. Fink in conjunction with Dr. Alexander's delay in responding to Sun Life's request for information caused the delay.

94. Mr. Doane's January 14, 2005 letter also requested that Mr. Fink undergo an IME arranged by Sun Life.  Sun Life's justified its request for an IME almost one year following the termination of Mr. Fink's claim by the Plan as well as the Department of Labor ("DOL") regulations requiring that insurers "have any additional medical information submitted on appeal reviewed by a health care professional with appropriate training and experience in the relevant field(s) of medicine."

95. The DOL regulations do not require that insurers request an IME of all claimants on appeal, but rather than insurers "consult" with a medical professional with experience in the "relevant field(s) of medicine" when reviewing a claimant's appeal.

96. On January 21, 2005, counsel for Mr. Fink wrote Mr. Doane responding to Sun Life's January 14, 2005 letter and clarifying information missing from Sun Life's chronology. In response to Sun Life's concerns regarding the volume of information submitted on appeal, Mr. Fink indicated: 1/ the burden of proof resides upon Mr. Fink to demonstrate total disability; 2/ the constrains of ERISA – limiting judicial review of an insurer's denial to the record created during the internal appeal process – mandates that Mr. Fink respond each argument raised by Sun Life and submit supporting information; 3/ the Plan terms require Mr. Fink to be under the regular care of a physician; the additional information submitted supports the Plan provision regarding ongoing care; 4/ all medical information was submitted to Sun Life on or by November 1, 2004, with the exception of Dr. Glenn's report; 5/ Mr. Fink provided Sun Life with three extensions, until January 14, 2005, to render a decision; 6/ the medical evidence submitted with Mr. Fink's appeal demonstrates his continued motivation to regain his prior health and to return to work; and 7/ Sun Life failed to transfer Mr. Fink's appeal to the appropriate department until the second week in December 2004, four months following the submission of Mr. Fink's appeal.

97. Regarding Sun Life's request for an IME, Mr. Fink's counsel indicated that the request was untimely, and that Mr. Fink had already undergone two IMEs since Sun Life terminated his benefits. Mr. Fink's counsel further indicated that an IME "would not be appropriate unless Sun Life first placed Mr. Fink in pay status which would give rise to a contractual right to have him examined. As Sun Life is aware, Mr. Binette explained to me that in similar circumstances, where Sun

Life has required more than the statutory period of time to review a claim, it reinstates benefits under a reservation of rights pending the completion of its review.  ERISA requires that Mr. Fink be treated in an equivalent manner."

98. Mr. Fink concluded his January 21, 2005 letter by requesting  that Sun Life either render a decision on the record as it stood, or in the alternative, Sun Life reinstate his benefits, paying all back due benefits, in the event that it wishes to conduct an examination of Mr. Fink.

99. On January 27, 2005, Ms. Doherty-Sheldon called counsel for Mr. Fink to discuss Sun Life's review of Mr. Fink's claim.    During her call, Ms. Doherty-Sheldon indicated that Sun Life was prepared to pay Mr. Fink's monthly benefit for February and March 2005 in exchange for Mr. Fink's agreement to undergo an IME.

100.     On February 1, 2005, counsel for Mr. Fink wrote Ms. Doherty-Sheldon indicating that "[i]n the absence of any substantive response by Sun Life to my letter of January 21, 2005, Mr. Fink  must reject Sun Life's offer."   In particular, counsel for Mr. Fink stated:

> Under the terms of this contract, Sun Life has two choices: Either monitor an insured's condition when paying benefits, which includes the right to conduct a physical examination of the insured, or terminate benefits and review the state of affairs at the time of the denial of the claim.  There is no alternative, as Sun Life proposes here.   The contract does not contemplate two months of benefits in exchange for the ability to conduct a physical examination.

101.     Counsel for Mr. Fink concluded the February 1, 2005 letter by indicating that "Mr. Fink is willing to undergo Sun Life's medical examination under the terms detailed by Sun Life, in its contract."

102.    On February 9, 2005, Ms. Doherty-Sheldon wrote counsel for Mr. Fink asserting that the terms of the Plan and the DOL regulations provide support for Sun Life's request for an IME.    Specifically, Sun Life indicated that "in compliance with the DOL regulations, Sun Life determined that an opinion from a physician specializing in vestibular disorders was necessary." Sun Life further asserted that it was "in substantial compliance with the applicable DOL regulations and Sun Life has maintained an ongoing, good faith exchange of information with Mr. Fink and your office throughout the appeal."

103.    On February 15, 2005, counsel for Mr. Fink wrote Ms. Doherty-Sheldon indicating, in relevant part, that the DOL regulations require only a "consult with a health care professional" on appeal, and not a physical examination. Mr. Fink also noted that Sun Life already consulted with Dr. Alexander, a health care professional chosen by Sun Life, on appeal.  Mr. Fink further noted that by Sun Life's own admission, Mr. Fink had already undergone an IME with Dr. Glenn.

104.    The February 15, 2005 letter further responded to Sun Life's claim that it had "substantially complied" with ERISA's procedural regulations, thereby precluding de novo review in this matter.  Mr. Fink denied that the doctrine of "substantial compliance" applied to Sun Life's actions, in part because:  1/ Sun Life failed to submit Mr. Fink's claim to the appeals department until after the conclusion of the 90 days provided for Sun Life's appellate review; 2/ Sun Life failed to disclose the documents contained in its file as well as Dr. Alexander's report, despite numerous requests from Mr. Fink; 3/ unlike cases in which the "substantial compliance" doctrine has been invoked because a claimant has filed

suit days following the timeframe for appellate review, Mr. Fink waited to file suit for two months following the conclusion of Sun Life's period of time to review his claim, and did not serve the complaint because Sun Life promised a decision on or by January 14, 2005; and 4/ at no time did Sun Life assert that it had insufficient information on which to render a decision.

105.    On February 18, 2005, Ms. Doherty-Sheldon wrote counsel for Mr. Fink erroneously stating that "Mr. Fink has refused to attend the IME."  Sun Life newly justified its request for an IME on the basis that "in the event of litigation (as you have already filed) it is not unusual for a claimant to argue that his/her physicians should be afforded greater credibility because they physically examined the claimant rather than simply reviewing the medical records."

106.    Ms. Doherty-Sheldon's February 18, 2005 letter also responded to Mr. Fink's claim that the appeal process was unreasonably delayed, indicating that Sun Life "employs a two-tier appeal process."

107.    Neither the Plan nor Sun Life's March 3, 2004 termination letter referenced a "two-tier appeal process."

108.    Mr. Doherty-Sheldon also included a copy of Dr. Alexander's December 16, 2004 report with her February 18, 2005 letter.  However, Ms. Doherty-Sheldon still did not provide copies of the other documents requested in counsel to Mr. Fink's December 12, 2004 letter.

109.    Dr. Alexander's December 16, 2004 report indicated in relevant part:

I reviewed the supplementary letter that I sent after evaluating Mr. Fink, and I find no reason in the new information to change the conclusions: he is subjectively disabled but, as of yet, no plausible neurological basis for this disability has been established.

110.     On March 14, 2005, counsel for Mr. Fink responded to the inaccuracies contained in Ms. Doherty-Sheldon's February 18, 2005 letter, as well as Ms. Doherty-Sheldon's claim that Sun Life employs a "two-tier appeal process." Mr. Fink further responded to Sun Life's erroneous interpretation of the DOL regulations regarding a physician consult on appeal.

111.     Finally, the March 14, 2005 letter responded to Sun Life's clear misrepresentation of Mr. Fink's position regarding its requested IME. In particular, Mr. Fink noted that:

> On the contrary, Mr. Fink's position is, and has been, that any insurance examination conducted at this juncture will be relevant only to evaluating his current medical condition, and will not shed light on his condition over a year ago at the time Sun Life improperly terminated his claim. This position is consistent with both the terms of the Plan and the law. Consistent with this position, Mr. Fink asked that Sun Life reinstate his benefits under a reservation of rights prior to conducting the examination, in significant part because Mr. Binette had previously indicated that Sun Life reinstates benefits when it has exceeded the timeframe for its appellate review. Sun Life has never articulated why Mr. Fink's situation differs from that of its other ERISA claimants in this regard.

112.     Counsel for Mr. Fink further indicated in her March 14, 2005 letter:

> Mr. Fink does not fear the possibility of another physical examination. He has nothing to hide. In fact, as Sun Life acknowledges, Mr. Fink underwent his own independent medical examination with Dr. Mel Glenn in October 2004. However, Mr. Fink reasonably insists that any examination be conducted in accordance with the terms of the Plan and the law. For all the reasons set forth above, Mr. Fink will attend the requested examination if Sun Life will stipulate in advance that the examination is relevant only as to his current medical condition, and not to his condition at the time his claim was improperly terminated or any other time in the interim.

113.     Sun Life refused to agree to the stipulation regarding the IME proposed by Mr. Fink. This is despite the fact that any examination of Mr. Fink today, over

one year following Sun Life's termination of his claim, will only reference Mr. Fink's current medical condition, and not his condition at the time Sun Life terminated his claim.

114.     Sun Life has failed to render a decision on Mr. Fink's claim for benefits to date.

## Social Security Disability Income Benefits

115.     On or about November 22, 2004, Mr. Fink was approved for SSDI benefits under a far more rigorous standard of disability than that which exists under the Plan. Mr. Fink's claim was decided on the record, despite the fact that he was waiting for a hearing from an administrative law judge.

116.     Specifically, the Social Security Administration ("SSA") requires a claimant to show an "inability to do any substantial gainful activity by reason of any medically determinable physical or medical impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months" in order to prove disability. 20 C.F.R. § 404.1505(a).

117.     By a letter dated January 12, 2005, Mr. Fink was informed that his SSDI award was reversed by an internal audit that concluded the administrative law judge should hold a hearing rather than deciding Mr. Fink's claim "on the record". Mr. Fink's claim is now placed back in line for a hearing before an administrative law judge and is pending.

**Sun Life's Review of Mr. Fink's Claim**

118.    Sun Life's failure to render a determination on Mr. Fink's claim for benefits within the timeframe proscribed by ERISA demonstrates that its claims procedure was unreasonable.

119.    Mr. Fink has exhausted his administrative remedies pursuant to 29 C.F.R. 2560.503-1(1).

120.    Any discretion to which Sun Life may claim it is entitled under the Plan is negated by its failure to provide Mr. Fink with an explanation as to its adverse action and its failure to render a decision on Mr. Fink's appeal within the time frames proscribed by ERISA and its implementing regulations.

121.    Sun Life has failed to meet the minimum requirements for the denial of Mr. Fink's LTD benefits, in violation of ERISA, 29 U.S.C. 1133, which requires that upon a denial of benefits, the administrative review procedure must include adequate notice in writing setting forth the specific reasons for the denial of benefits and a reasonable opportunity for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

122.    Sun Life has also failed to meet the Plan requirements for review of claims that have been denied.

**Summary**

123.    Mr. Fink remains totally disabled to this day as a result of the debilitating symptoms of his conditions.

124.    Mr. Fink has exhausted his administrative remedies pursuant to 29 C.F.R. 2560.503-1(1).

125.    The Defendants failed to provide Mr. Fink with a full and fair review of his claim for benefits.

126.    Any discretion to which Defendants may claim it is entitled under the Plan is negated by its failure to provide Mr. Fink with an explanation as to its adverse action and a full and fair review of his claim for benefits.

127.    The decision to deny Mr. Fink's benefits was wrongful, unreasonable, irrational, contrary to the substantial evidence, contrary to the terms of the Plan and contrary to law.

128.    Sun Life was influenced by its financial conflict of interest, as both the administrator of the Plan and the payor of benefits thereunder, when it denied Mr. Fink's benefits.

129.    Due to the unlawful denial of benefits under ERISA, Mr. Fink has been deprived of his rightful long-term disability benefits.

130.    Mr. Fink has also suffered emotional distress and an exacerbation of his physical condition as a result of Sun Life=s actions.

131.    Due to the unlawful denial of benefits under ERISA, Mr. Fink has lost the use of his long-term disability benefits.

132.    Having exhausted the administrative procedures provided by the Defendants, Mr. Fink now brings this action.

**FIRST CAUSE OF ACTION**
**(Enforcement of Terms of Plan**
**Action for Unpaid Benefits)**
**(ALL DEFENDANTS)**

133.    Mr. Fink realleges each of the paragraphs above as if fully set forth herein.

134.    The Plan is a contract.

135.    Mr. Fink has performed all of his obligations under the contract.

136.    29 U.S.C. ' 1132(a)(1)(B) states that:

A civil action may be brought ---

(1)    by a participant or beneficiary B

(A)  for the relief provided for in subsection (c) of this section, or

(B)  to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.

137.    The Defendants= actions constitute an unlawful denial of benefits under ERISA, as provided in 29 U.S.C. ' 1132(a)(1)(B).

138.    The Defendants unlawfully denied Mr. Fink's benefits in part by: (1) rejecting, without any basis, the substantial evidence supporting Mr. Fink's claim for disability; and (2) denying Mr. Fink a full and fair review of their decision to deny his benefits.

139.    In accordance with 29 U.S.C. ' 1132, Mr. Fink is entitled to be paid benefits under the Plan based upon his disabled status from and after March 2004, and continuing into the present.

140.    The Defendants have refused to provide Mr. Fink with these disability benefits and are, therefore, in breach of the terms of the Plan and ERISA, which requires that the Defendants engage in a full and fair review of all claims and the administration of the Plan in the best interests of the Plan participants.

141.    As a direct and proximate result of this breach, Mr. Fink has lost the principal and the use of his rightful LTD benefits.

## SECOND CAUSE OF ACTION
### (Attorneys' Fees and Costs)
### (ALL DEFENDANTS)

142.    Mr. Fink realleges each of the paragraphs above as if fully set forth herein.

143.    Under the standards applicable to ERISA, Mr. Fink deserves to recover Aa reasonable attorney=s fee and costs of the action@ herein, pursuant to section 502(g)(1) of ERISA, 29 U.S.C. ' 1132(g).

144.    The Defendants have the ability to satisfy the award.

145.    Mr. Fink's conduct of this action is in the interests of all participants who subscribe to the Plan, and the relief granted hereunder will benefit all such participants.

146.    The Defendants acted in bad faith in denying Mr. Fink benefits under the Plan.

147.    The award of attorneys= fees against the Defendants will deter others acting under similar circumstances.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff respectfully prays that the Court:

    i.  Declare, adjudge and decree that Mr. Fink is entitled to ongoing LTD benefits as calculated under the terms of the Plan;

    ii. Award Mr. Fink the full amount of unpaid benefits under the Plan to which he is entitled, together with such pre-judgment interest as may be allowed by law;

    iii. Order that the Defendants make restitution to Mr. Fink in the amount of any losses sustained by Mr. Fink in consequence of the

wrongful conduct alleged herein, together with prejudgment interest;

iv.  Award Mr. Fink the costs of this action and reasonable attorneys= fees; and

v.  Award such other relief as the court deems just and reasonable.

Dated: April 12, 2005                              Respectfully submitted for the Plaintiff,

By:  /s/ Mala M. Rafik
Mala M. Rafik
BBO No. 638075
ROSENFELD & RAFIK, P.C.
44 School Street, Suite 410
Boston, MA 02108
617-723-7470

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 12th day of April, 2005, one copy of the above document was delivered via electronic mail, to counsel for the Defendants.

/s/ Mala M. Rafik
Mala M. Rafik

29